IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MICHELLE ATENCIO,
as Personal Representative of the
ESTATE OF GARY E. ATENCIO, Deceased,

        Plaintiff,

v.                                                                                              15cv343 WPL/KK

THE CITY OF ALBUQUERQUE and
ALBUQUERQUE POLICE OFFICER
RUSSELL "RUSS" CARTER,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

    Defendant Russell Carter filed two motions in this case: a motion for summary judgment requesting dismissal of all of Plaintiff Michelle Atencio's claims against him based on qualified immunity (Doc. 13) and a motion to strike the affidavit of Ms. Atencio's expert, Maurice Moya (Doc. 25). Ms. Atencio filed a response to the motion for summary judgment (Doc. 18) and a response to the motion to strike (Doc. 26). Having read and considered the briefing, case record, and relevant law, I grant Carter's motion for summary judgment and deny the motion to strike as moot.

**BACKGROUND**

    Ms. Atencio is the widow of Gary Atencio and the Personal Representative of his estate. She claims that Carter, a police officer with the Albuquerque Police Department ("APD"), is liable under 42 U.S.C. § 1983 for excessive force and unreasonable seizure in violation of the

Fourth Amendment for using deadly force in an encounter with Mr. Atencio on March 21, 2012. Carter moves for summary judgment on the basis of qualified immunity.

The following facts are taken from video recordings and interview transcripts of the incident in question. I construe the facts in the light most favorable to Ms. Atencio as the non-movant. *See Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1312 (10th Cir. 2009).

On March 21, 2012, at approximately 1:00 p.m., APD Dispatch broadcast that 911 callers at Golf Course and Ellison, near the Lovelace Westside Hospital, observed a female jump out of a yellow Ford Mustang and the driver of the Mustang, Mr. Atencio, shooting at her. Carter, who was on duty and assigned to the tactical section, heard the broadcast and responded. As Carter attempted to locate the Mustang, he heard a second radio transmission that Mr. Atencio may have shot at another person at a second location at Unser and McMahon.[1] Meanwhile, other officers followed behind Mr. Atencio, with lights and sirens activated, attempting to stop him. The chase proceeded through the city. Mr. Atencio ran multiple red lights, drove at high speeds, and continued onto I-40 west at speeds of over 120 miles per hour. As the pursuit left the Albuquerque city limits, Carter obtained information via cell phone and car-to-car radio transmission, including that Mr. Atencio was talking to his sister on a cell phone and telling her he was suicidal. APD tactical officers and New Mexico State Police continued the pursuit and were later joined by officers from the Laguna Police Department. After travelling a distance of approximately 60 miles, the pursuit ended in Laguna Pueblo when Mr. Atencio crashed the Mustang into the back of a semi-truck.

Mr. Atencio then fled on foot into the desert north of I-40 armed with a pistol. Officers from the Laguna Police Department followed closely behind him. Mr. Atencio walked through

---

[1] Though neither party noted this fact, Carter apparently considered it when evaluating whether to use deadly force. (*See* Doc. 13 Ex. 8 at 2 ("I heard over the Northwest radio communications that the offender was now shooting at a third person or a third vehicle.").)

the yard of a residence, talked on his phone, and held a gun to his head with his left hand. The officers repeatedly told Mr. Atencio to stop and put down the weapon, but Mr. Atencio continued to flee. Shortly after, officers from the New Mexico State Police and APD joined in the foot pursuit. APD officers warned Mr. Atencio that if he did not stop they would shoot him.

At some point, Mr. Atencio switched the gun from his left to right hand and continued over a railroad berm toward a cluster of residences and a public road approximately 100-150 yards away.[2] Meanwhile, Carter walked onto the railroad berm and saw Mr. Atencio cross under a barbed wire fence and continue moving toward the residences and road while holding the gun at his side. Carter then fired one round from his M4 rifle at Mr. Atencio. The bullet struck Mr. Atencio in the back and exited through his chest.  After the shot, Mr. Atenico fell to the ground and did not move. Shortly after, the officers used a Noise Flash Diversionary Device, released a police dog, handcuffed Mr. Atencio, and called an ambulance. Mr. Atencio "appeared to be deceased" when he was taken into custody. (Doc. 18 Ex. 1 at 12.)

## DISCUSSION

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if under the governing law it could have an effect on the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if a rational jury could find in favor of the nonmoving party on the evidence presented. *Id.* The record and all reasonable inferences therefrom must be viewed in the light most favorable to the non-movant. *See Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000).

---

[2] The parties give varying estimates about the distance between Mr. Atencio and the residences and road.  In the complaint, Ms. Atencio alleges 100-150 yards.  Lapel video suggests 100-150 yards is a reasonable estimate. *See* Doc. 14 Ex. I at 13:40-13:45.

Summary judgment motions raising the defense of qualified immunity differ from traditional summary judgment motions because "the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). Rather than focus on "material issues that warrant resolution by a jury," the purpose of a qualified immunity analysis is to "determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts" that the court will use to analyze the legal question before it. *Thomson*, 584 F.3d at 1326 (Holmes, J., concurring). It is only after the plaintiff satisfies her two-part burden that "the burden shift[s] to the defendant[] to prove that no genuine issue of material fact exists." *Gallegos v. City & Cty. of Denver*, 984 F.2d 358, 361 (10th Cir. 1993). If the plaintiff fails to satisfy this "heavy two-part burden" and overcome the "rebuttable presumption" of qualified immunity, the defendant is entitled to summary judgment. *Medina v. Cram*, 252 F.3d 1124, 1128-29 (10th Cir. 2001). The court has discretion to decide which of the two parts to analyze first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

## ANALYSIS

To prevail in this action and overcome the qualified immunity hurdle, Ms. Atencio must show, for each claim, that Mr. Atencio's rights were in fact violated, and that a reasonable officer would have known that Carter's use of deadly force clearly violated these rights. *See id.* at 232. I discuss each claim individually, though both involve a reasonableness inquiry and require similar analysis.

### I.  Excessive Force

"To state a claim of excessive force under the Fourth Amendment, a plaintiff must show both that a 'seizure' occurred and that the seizure was 'unreasonable.'" *Bella v. Chamberlain*, 24

F.3d 1251, 1255 (10th Cir. 1994). Factors to consider when assessing reasonableness under the totality of the circumstances and from the perspective of the officer on scene include, but are not limited to, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). When evaluating whether the force used was excessive, the court must balance the intrusion to the individual with the government interests at stake. *Id.*

The use of deadly force to apprehend a fleeing felon "is not constitutionally unreasonable" when the officer "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). Flight from "the commission of an inherently violent crime" justifies "an officer's belief that a fleeing suspect poses a threat of serious physical harm." *Ryder v. City of Topeka*, 814 F.2d 1412, 1419 (10th Cir. 1987). Two recent Supreme Court cases have found no constitutional violation when police used deadly force to terminate pursuits of fleeing motorists. *See Scott v. Harris*, 550 U.S. 372, 386 (2007) ("A police officer's attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death."); *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2022 (2014) ("[I]t is beyond serious dispute that Rickard's flight posed a grave public safety risk, and here, as in *Scott*, the police acted reasonably in using deadly force to end that risk.").

A.   <u>Was There a Constitutional Violation?</u>

Ms. Atencio asserts that "the circumstances of Mr. Atencio's death establish a constitutional violation and use of excessive force." (Doc. 18 at 21.) When viewed from Carter's

5

perspective, I cannot say that deadly force was unreasonable under these circumstances. Carter, from the railroad berm, saw Mr. Atencio slip under a barbed wire fence, repeatedly look back at the officers, and run "straight for" a highway with traffic on it and a residential compound, all after committing several violent felonies and still carrying a gun. (Doc. 18 Ex. 1 at 9.) Carter's concern that he had no "way of stopping" Mr. Atencio if Mr. Atencio tried to "carjack somebody" or commit "some felonious assault" was reasonable given the distance between the officers and Mr. Atencio and the violent crimes that precipitated the incident. (*Id*.) This fact in particular—that Mr. Atencio was fleeing after shooting at someone from a motor vehicle— weighs heavily in Carter's favor under *Graham*'s "severity of the crime" factor. Moreover, *Scott* and *Plumhoff* permit officers to use deadly force when a fleeing suspect poses a "grave public safety risk," and a fleeing gunman disregarding officers' commands and rapidly approaching a road and residences poses a grave public safety risk. *Plumhoff*, 134 S. Ct. at 2022.

Plaintiff relies on two Tenth Circuit cases, *Cordova v. Aragon*, 569 F.3d 1183 (10th Cir. 2009), and *Allen v. Muskogee*, 119 F.3d 837 (10th Cir. 1997), for the proposition that Carter's actions were a constitutional violation. In *Cordova*, the Tenth Circuit held that deadly force was an unreasonable means to stop a fleeing motorist driving recklessly on the wrong side of a highway in the dark because the motorist did not pose an imminent threat to the public or officers. *Id.* at 1189-90. The court reasoned that "[w]hen an officer employs such a level of force that death is nearly certain, he must do so based on more than the general dangers posed by reckless driving." *Id.* at 1190. After establishing the constitutional violation, the court nevertheless granted qualified immunity to the officer because "[t]he law in our circuit and elsewhere has been vague on whether the potential risk to unknown third parties is sufficient to justify the use of force nearly certain to cause death." *Id.* at 1193.

Applying *Cordova* to the present case as Ms. Atencio suggests would require holding that Mr. Atencio's flight posed only a general danger to the public. This I cannot do. The suspect in *Cordova* threatened the public by reckless driving. Mr. Atencio, in comparison, threatened the public by running toward houses and a road armed with a gun after he had shot at someone. This case differs from *Cordova* because the underlying crime was more severe and the means to threaten the public were more pronounced. Given the totality of the circumstances from Carter's perspective, I cannot agree that Mr. Atencio's flight posed only a general danger to the public.

Ms. Atencio's second case, *Allen*, is less helpful to her. In *Allen*, the Tenth Circuit reversed the district court's grant of summary judgment for the officers because the record contained conflicting eyewitness testimony about whether the officers' behavior was reckless and precipitated the use of deadly force. *Id.* at 841. Though the facts in *Allen* are similar to this case because officers shot and killed a suicidal individual wielding a gun, the analogy fails for at least two reasons. First, the *Allen* court did not wade into the merits or express an opinion about whether the officers' actions were reasonable. *Id.* at 841 ("[W]e express no opinion on the merits . . . ."). Instead, *Allen* concerned whether eyewitness disputes constituted genuine issues of material fact. *Id.* Second, *Allen* did not involve a qualified immunity defense, so "the defendants' summary judgment motion was, therefore, judged under the typical summary judgment standard, which requires a lesser showing by the plaintiff." *Medina*, 252 F.3d at 1132-33 (discussing *Allen*).

    B.    <u>Was the Law Clearly Established?</u>

Even if Ms. Atencio could show that Carter's actions violated the Fourth Amendment, her claim fails on the second prong of qualified immunity because clearly established law in 2012 did not put Carter on notice that his conduct amounted to a constitutional violation. *See*

*Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Weigel v. Broad,* 544 F.3d 1143, 1153 (10th Cir. 2008) (quotations omitted). "[Officers] can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 740 (2002).  However, the contours of the right must be sufficiently clear such that "every reasonable [officer] would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (citations omitted). In recent years, qualified immunity analysis has shifted away from "a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law puts [officers] on fair notice that the described conduct was unconstitutional." *Fancher v. Barrientos*, 723 F.3d 1191, 1201 (10th Cir. 2013) (citations omitted).

     Ms. Atencio again relies on *Cordova* and *Allen* for the proposition that the law was clearly established and Carter was on notice about the unconstitutionality of his actions. As noted above, I am not persuaded that the Tenth Circuit's analysis of the danger posed by a reckless motorist in *Cordova* puts a reasonable officer on notice that it violates the Constitution to use deadly force to stop a suspect who shot at a person, engaged in a cross-jurisdictional police chase, and ran toward a residential compound and public road armed with a gun. Said another way, I am not persuaded that it is "beyond debate" that *Cordova* prohibited Carter's use of deadly force.  *See Ashcroft*, 131 S. Ct. at 2083 ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."). Moreover, the Tenth Circuit in *Allen* did not assess the officers' reasonableness, so factual analogy is unhelpful.

In addition to *Cordova* and *Allen*, Ms. Atencio's excessive force claim is permeated with the conclusion that Mr. Atencio was suicidal, not homicidal. Though this conclusion may have merit, I do not believe Carter was unreasonable to believe otherwise. Moreover, even if I accept Ms. Atencio's conclusion, Carter's decision to use deadly force remains in "the hazy border between excessive and acceptable force," which is resolved in favor of the officer under qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 206 (2001), *overruled on other grounds by Pearson*, 555 U.S. at 236.

## II.   Unreasonable Seizure

Ms. Atencio's unreasonable seizure claim, like her excessive force claim, involves analysis of the objective reasonableness of Carter's actions. Ms. Atencio alleges that Carter violated Mr. Atencio's Fourth Amendment right to be free from unreasonable seizures when he used deadly force. The reasonableness of a seizure is based on the totality of the circumstances and "depends on not only when [it] is made, but also how it is carried out." *Garner*, 471 U.S. at 8. In assessing reasonableness, the court "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Scott*, 550 U.S. at 383 (quotation omitted). Additionally, reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Here, Ms. Atencio concedes that a seizure justified by both reasonable suspicion and probable cause occurred when Carter shot and killed Mr. Atencio. This concession narrows the inquiry to whether Carter's actions in effecting the seizure were objectively reasonable.

To support her argument that "[s]hooting a mentally ill person, who is fleeing, in the back, killing them, is an unreasonable means of effecting a seizure" (Doc. 18 at 16), Ms. Atencio

relies solely on *Allen*. As noted above, *Allen* does not provide a viable fact pattern for comparison. Given Ms. Atencio's lack of authority in support of her argument, and for the reasonableness analysis conducted above with regard to excessive force, Ms. Atencio failed to carry her burden of establishing that Carter's seizure violated this constitutional right.

## CONCLUSION

For the reasons explained above, I conclude that Ms. Atencio has failed to show that Carter violated a constitutional right that was clearly established. Carter is therefore entitled to qualified immunity with respect to the excessive force and unreasonable seizure claims against him, and the claims are dismissed with prejudice. Because I grant Carter's motion for summary judgment, his motion to strike the affidavit of Ms. Atencio's expert is moot and therefore denied.

*William P. Lynch*
William P. Lynch
United States Magistrate Judge